IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-00781-RBJ

EUGENE F. FERRARO, an individual,

    Plaintiff,

v.

CONVERCENT, INC., a Delaware corporation,
O'NEAL PATRICK QUINLAN, III, an individual,
STEVE FOSTER, an individual, and
NEBBIOLO VENTURES, LLC, a Colorado limited liability company,

    Defendants.

---

## ORDER

---

This matter is before the Court on four motions: (1) defendant Nebbiolo's motion for summary judgment, ECF No. 56; (2) defendants Convercent, Quinlan, and Foster's motion for summary judgment, ECF No. 57; (3) plaintiff's motion to strike section one of Nebbiolo's reply brief, ECF No. 65; and (4) defendants' joint motion to strike plaintiff's expert designation of Michael Orlando, ECF No. 68. For the reasons stated below, Nebbiolo's summary judgment motion is DENIED, defendants Convercent, Quinlan, and Foster's summary judgment motion is GRANTED in part and DENIED in part, plaintiff's motion to strike is DENIED as moot, and defendants' joint motion to strike plaintiff's expert designation is DENIED.

## I. FACTS

Eugene Ferraro is an experienced corporate investigator specializing in complex workplace investigations. Complaint, ECF No. 1, at 3. In 1994 he formed a company called Group Dynamics, LLC, which offered clients a service for employees to report ethical, safety,

1

and regulatory infractions anonymously without fear of retaliation. *Id.* at 4. Group Dynamics later became Business Controls, Inc. and eventually Convercent, Inc. (referred to as "Convercent" or "the Company"). *Id.* In 2000 the Company began offering so-called professional services such as investigative, consulting, and training services to complement its traditional web-based whistleblower service. *Id.* In 2012 after Mr. Ferraro recognized the need for additional capital to continue the Company's growth, the Company's then-president, Steve Foster, introduced Mr. Ferraro to a consulting firm called Nebbiolo, led by O'Neal Patrick Quinlan, III. *Id.* at 5. Mr. Quinlan assured Mr. Ferraro that Nebbiolo could quickly increase the value of the Company, from $6-8 million in 2012 to $30-40 million by 2014. *Id.* at 5–6.

Mr. Ferraro tasked Mr. Foster with performing due diligence on Nebbiolo, and at the completion of the due diligence, Mr. Foster assured Mr. Ferraro that Nebbiolo was a reputable and accredited investor. *Id.* at 6. But Mr. Foster failed to disclose that Nebbiolo did not have any accomplishments or accreditation as a company, likely because it was formed just four months prior. *Id.* Perhaps even more telling is that, according to the Complaint, Mr. Foster failed to disclose that he personally invested (or loaned) approximately $68,000 to Nebbiolo in early 2012. *Id.* at 7.

Acting on Mr. Foster's representations, Mr. Ferraro entered into a professional services agreement ("PSA") with Nebbiolo in March 2012. *Id.* at 8. The PSA required Nebbiolo to provide financial and management consulting services in exchange for a fee and equity in the Company. *Id.* Nonetheless, Nebbiolo lacked the funds to purchase the stock outright at the time of signing, so Mr. Ferraro accepted a four-year note for $1.95 million from Nebbiolo for the stock purchase. *Id.* at 9. A further condition of the PSA required Mr. Ferraro to resign as CEO so Mr. Quinlan could fill that role. *Id.* at 8. Mr. Quinlan verbally assured Mr. Ferraro that he

could remain employed with the Company for as long as he wished, or until the Company was sold. *Id.*

Having relinquished his role as CEO, Mr. Ferraro requested an official job title to memorialize his position within the Company. *Id.* at 11. In January 2013 he signed a three-year employment agreement to serve as the Company's chief ethics officer. *Id.* The agreement provided that Mr. Ferraro would maintain his current salary (the same salary he received as CEO). *Id.* It also contained a provision that required the Company to pay him $5,000 per month for each month Mr. Ferraro remained a guarantor on the corporate loans, if the loans were not satisfied by July 2013. *Id.* at 12. Although the agreement did not contain a renewal provision, Mr. Ferraro claims that Mr. Quinlan promised at the time of signing—and repeatedly during the employment term—that he would renew Mr. Ferraro's agreement if the Company had not been sold by the end of the three-year term. *Id.* Despite Mr. Quinlan's assurances, the Company decided not to renew his employment agreement when his term expired. *Id.* at 15. The Company did not offer him another position. Mr. Ferraro's last day of employment was January 3, 2016. *Id.* at 18. He was 62 years old. *Id.* at 16. Mr. Ferraro filed this lawsuit on March 28, 2017. He originally asserted twelve claims, but after settlement discussions, ten claims remain.

## II. STANDARD OF REVIEW

### A. **Standards Governing Summary Judgment.**

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A

fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the nonmoving party. *Concrete Works of Colorado, Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

### B. Standards Governing Expert Testimony.

Under Rule 702 of the Federal Rules of Evidence, a qualified expert may provide opinion testimony if his specialized knowledge would assist the jury in doing its job (factfinding), and the opinions are based on sufficient facts and reliable methods properly applied to the facts. Put another way, the evidence must be both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Expert opinions are relevant if they would "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 591. They are reliable if, in addition to the expert being qualified, his opinions are "scientifically valid" and based on "reasoning or methodology [that] properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593.

The proponent of expert testimony has the burden to show that the testimony is admissible. *Nacchio*, 555 F.3d at 1241. The trial court plays a "gatekeeping" role that involves an assessment of the "reasoning and methodology underlying the expert's opinion" and a determination of "whether it is scientifically valid and applicable to a particular set of facts." *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). However, the trial court has discretion as to how to perform this gatekeeping function. *Id.* It is

not a role that emphasizes exclusion of expert testimony. Judge Kane aptly summarized the thrust of *Daubert* in interpreting and applying Rule 702:

> A key but sometimes forgotten principle of Rule 702 and *Daubert* is that Rule 702, both before and after *Daubert*, was intended to relax traditional barriers to admission of expert opinion testimony. Accordingly, courts are in agreement that Rule 702 mandates a liberal standard for the admissibility of expert testimony. As the Advisory Committee to the 2000 amendments to Rule 702 noted with apparent approval, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."

*Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006) (citations omitted).

### III. ANALYSIS

**A. Summary Judgment Motions, ECF Nos. 56 and 57.**

I have studied the summary judgment motions and considered the arguments the parties' presented to the Court. It is apparent from reading the motions, responses, and replies that genuine and material fact disputes exist in this case as to all claims except plaintiff's sixth claim for relief.

Plaintiff's sixth claim asserts a claim for breach of the duty of good faith and fair dealing against Convercent only. ECF No. 1 at 24. He alleges that "Convercent failed to act in good faith and deal fairly with Mr. Ferraro in exercising its discretion in delegating the duties to be performed by Mr. Ferraro, renegotiate the terms of the agreement, and in renewing his employment agreement." *Id.* at 25. Defendants argue that there is no cause of action under Colorado law for breach of the implied covenant of good faith and fair dealing in the employment context. I agree with defendants.

Several Colorado and federal courts applying Colorado law have declined to recognize this cause of action. *See Shepherd v. U.S. Olympic Comm.*, 94 F. Supp. 2d 1136, 1148–49 (D. Colo. 2000) (collecting case law). My conclusion might be different if plaintiff asserted that

5

Convercent violated an express term of his employment agreement. In that case, he could properly assert a breach of contract claim. *Id.* But that is not the case here. Plaintiff's complaint fails to identify any specific provisions that defendant breached. Rather, it broadly discusses that "every contract imposes upon each party the duty of good faith and fair dealing in its performance and its enforcement," and that the employment agreement vested discretion in Convercent to decide whether to renew his contract. ECF No. 1 at 25. Accordingly, defendants' motion for summary judgment on plaintiff's sixth claim for relief is granted, and that claim is dismissed with prejudice.

In sum, defendant Nebbiolo's motion for summary judgment is denied. Defendants Convercent, Quinlan, and Foster's motion for summary judgment is granted in part and denied in part.

### B. **Plaintiff's Motion to Strike Section One of Nebbiolo's Reply Brief, ECF No. 65.**

Having resolved Nebbiolo's summary judgment motion in plaintiff's favor, plaintiff's motion to strike section one of Nebbiolo's reply brief is denied as moot.

### C. **Defendants' Motion to Strike Plaintiff's Expert Designation of Michael Orlando, ECF No. 68.**

Defendants jointly move to strike the designation of Dr. Michael Orlando as an expert on the grounds that his opinions do not meet the *Daubert* requirements. This motion was fully briefed upon the filing of defendants' reply brief on July 25, 2018.[1]

---

[1] The Court acknowledges defendants' request that the Court set an evidentiary hearing if it does not exclude Dr. Orlando's opinions on the briefs. ECF No. 68 at 15. However, a hearing is not always required. *See United States v. Nacchio,* 555 F.3d 1234, 1253–58 (10th Cir. 2009). In this instance, in addition to defendants' motion and reply and Dr. Orlando's report, I have considered additional evidence submitted by defendants including the report of defendants' economics expert, Glenn W. Perdue, ECF No. 68-2; excerpts of defendants' deposition of Dr. Orlando, ECF Nos. 68-4 and 72-2; and excerpts of defendants' deposition of Mr. Ferraro, ECF Nos. 68-1 and 72-1. I am satisfied that defendants have had a

According to his expert disclosure report, Dr. Orlando holds a Ph.D. and master's degree in economics from Washington University in St. Louis. ECF No. 68-3 at 26. He has also earned an MBA from Tulane University. *Id.* His relevant professional experience includes the following: (1) lecturer in global energy management at University of Colorado - Denver, 2012 - present; (2) principal and owner of Economic Advisors, Inc., 2008 – 2018; (3) business school professor at Tulane University, 2009 – 2011; and (4) senior economist and vice president at the Federal Reserve Bank of Kansas City, 2000 – 2007. *Id.*

Plaintiff hired Dr. Orlando in this case as a specially retained witness to provide expert testimony on damages. He prepared an 11-page report that sets forth his expert opinions. *Id.* at 4–14. As part of his damages calculation, he estimated the value of plaintiff's shares in Convercent as of December 31, 2017. *Id.* at 13.

Defendants take issue with the relevance and reliability of Dr. Orlando's report. They argue that plaintiff is barred from recovering the current value of his Convercent shares, and instead, plaintiff must seek today's projected value of Business Controls, Inc.'s shares as if the PSA had never occurred. ECF No. 68 at 2. Defendants take this position because plaintiff testified during his deposition that he would not have entered into the PSA had he known then what he knows now about Nebbiolo. *Id.* Defendants argue that even if the Court allows plaintiff to change the theory of his case, Dr. Orlando's report should have valued Convercent's share price as of 2015, not 2017, because plaintiff's complaint alleges that defendants promised him that a liquidity event would occur within three years of Nebbiolo's takeover. ECF No. 72 at 2. Defendants then argue that Dr. Orlando's testimony is not based on sufficient facts and data because he failed to consider mitigation in his report. ECF No. 68 at 3. Finally, defendants

---

fair and sufficient opportunity to challenge the admission of Dr. Orlando's testimony, and therefore, I deny the request for an evidentiary hearing.

allege that Dr. Orlando's testimony lacks reliability because he has no experience valuing a "software-as-a-service" company. *Id.* at 14.

In response, plaintiff alleges that the current value of his Convercent shares is a proper remedy because he entered into the PSA based on fraud and negligent misrepresentation, and Colorado law allows a defrauded party to elect a remedy. ECF No. 69 at 4. Next, plaintiff alleges that Dr. Orlando's testimony is admissible because it is based on the same facts and data which defendants' expert relied. *Id.* at 7. Lastly, plaintiff explains that Dr. Orlando has expertise in valuing businesses; he recently valued a cannabis company and a medical devices company. *Id.* at 6.

1. Relevance of Dr. Orlando's Expert Testimony.

Whether Dr. Orlando's testimony is relevant depends on whether it would assist the jury in its damages determination. In this case, the average juror is unlikely to have the requisite knowledge to value a company's stock based on market indicators. Thus, an expert's opinion concerning damages would plainly assist the jury in determining damages. The only issue is whether Dr. Orlando's testimony is relevant to the damages plaintiff seeks in this case.

Defendants argue that Dr. Orlando's testimony is irrelevant because it doesn't fit with either of plaintiff's theories of the case. Defendants suggest that plaintiff lacks the ability to choose his remedy. They argue that plaintiff must settle for the projected value of Business Controls, Inc.'s shares today without any influence by Nebbiolo. Alternatively, if the Court allows plaintiff to seek the value of his Convercent shares, plaintiff's true measure of damages would be the value of Convercent's shares as of March 2015, not December 2017.

In this case, I cannot require plaintiff to select one remedy over the other. Colorado law dictates that the "choice of remedies belongs to the one defrauded." *Trimble v. City & Cty. of*

*Denver*, 697 P.2d 716, 723 (Colo. 1985), *superseded by statute on other grounds*, Colo. Rev. Stat. §§ 24–10–101 et seq. (1986).

> One seeking to remedy fraudulent inducement of a contract must elect either to rescind the entire contract to restore the conditions existing before the agreement was made, or to affirm the entire contract and recover the difference between the actual value of the benefits received and the value of those benefits if they had been as represented.

*Id.* It is within plaintiff's right to affirm the PSA and seek the value of his current Convercent shares. It is for the jury to decide whether plaintiff is entitled to any damages, and if so, whether he should recover the present value of his Convercent shares, the value of his shares as of March 2015, or the value of his shares as if the PSA never took effect. As such, Dr. Orlando's testimony valuing Convercent's shares as of December 2017 is relevant to the issue of damages.

  2. <u>Reliability of Dr. Orlando's Expert Testimony</u>.

Whether Dr. Orlando's testimony is reliable depends on whether he is qualified to testify as an expert, and whether he used reliable facts and methods to reach his conclusions. Defendants argue that Dr. Orlando lacks the requisite knowledge to testify regarding Convercent's value because he lacks experience valuing companies that specialize in software-as-a-service. But as I noted, Dr. Orlando has multiple degrees in economics to go along with his professional experience teaching and working in the field of economics. Although he has never valued a software-as-a-service company, he has valued companies in the cannabis and medical devices industry. The Tenth Circuit has held that an expert witness may testify in a related field even if the expert is not a specialist in the specific area. *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) (noting that "a lack of specialization does not affect the admissibility of the opinion, but only its weight"). Defendants have not stated why a business valuation of a software-as-a-service company is any different than valuing a company in the

9

cannabis and medical devices industry. Thus, I conclude that Dr. Orlando has the requisite knowledge, education, and experience to value a company such as Convercent.

Defendants next argue that Dr. Orlando's report is not based on sufficient facts and data because he failed to consider mitigation, and he did not base his opinions on deposition testimony, documentation regarding multiple rounds of financing, or the latest valuing report. Again, I do not agree with defendants. Dr. Orlando appears to have used similar data and facts as defendants' expert did to value the shares of Convercent. At trial, defendants are free to challenge the data on which Dr. Orlando based his opinion. I will not, however, preclude Dr. Orlando from testifying simply because the two experts have reached a different result. This is almost always the case with opposing experts. A jury may disagree with Dr. Orlando's testimony, especially since he did not consider mitigation in his report. But disagreeing with the approach and exact data used does not necessarily mean an expert's opinion is not reliable under Rule 702.

Finally, defendants challenge the principles that Dr. Orlando used to formulate his opinion as to the damages plaintiff sustained. Essentially, defendants argue that he should not have reached a certain number as to damages because his opinion was based on speculation. Further, defendants again allege that Dr. Orlando should have expressed an opinion, if any, on the value of Business Controls, Inc. without Nebbiolo ever entering the business equation.

I agree that there is some degree of speculation in Dr. Orlando's report, but that same degree of speculation would be present had he valued the shares of Business Controls, Inc. in the method defendants wish him to use. Further, there is typically some degree of speculation in expert testimony. My job as gatekeeper is to ensure that Dr. Orlando uses reliable methodology. In his deposition, Dr. Orlando testified that he used a "market-based methodology" to value the

shares, which was "based on the value of shares as reflected in common stock valuation analyses conducted by [Convercent's valuation company] in connection with third-party investments in Convercent." ECF No. 69 at 11. I find that Dr. Orlando's opinions based on his market-based methodology is reliable and admissible. If defendants wish to question the principles Dr. Orlando relied on in forming his opinion, they may explore those questions on cross-examination, just as defendants did during Dr. Orlando's deposition.

In sum, the Court concludes that Dr. Orlando's opinions as to the damages plaintiff sustained are admissible. There is no basis under Rule 702 or *Daubert* to exclude Dr. Orlando's expert opinion.

## ORDER

(1) Defendant Nebbiolo's motion for summary judgement, ECF No. 56, is DENIED.

(2) Defendants Convercent, Quinlan, and Foster's motion for summary judgment, ECF No. 57, is GRANTED in part and DENIED in part

(3) Plaintiff's motion to strike section one of Nebbiolo's reply brief, ECF No. 65, is DENIED as moot.

(4) Defendants' motion to strike expert designation of Michael Orlando, ECF No. 68, is DENIED.

DATED this day 12th day of December, 2018.

BY THE COURT:

R. Brooke Jackson
United States District Judge